STATE OF CONNECTICUT *v.* ROBERT MOYE

COTTER, C. J., LOISELLE, BOGDANSKI, LONGO and PETERS, Js.

Argued December 12, 1978—decision released May 15, 1979

*John R. Williams,* with whom, on the brief, was *Sue L. Wise,* for the appellant (defendant).

*Ernest J. Diette, Jr.,* assistant state's attorney, with whom, on the brief, were *Arnold Markle,* state's attorney, and *John J. Kelly,* assistant state's attorney, for the appellee (state).

LOISELLE, J. The defendant, Robert Moye, was indicted by a grand jury for the crime of murder in violation of § 53a-54a (a) of the General Statutes. Upon a trial to the jury, the defendant was found guilty as charged. From the judgment rendered on the verdict, the defendant has appealed to this court.

The claims the defendant has raised on this appeal are that the court erred (1) in its charge on intent; (2) in allowing testimony related to the defendant's postarrest silence; (3) in admitting evidence of prior bad acts and criminal conduct by the defendant; (4) in failing to grant the defendant's motion to suppress; and (5) in refusing to grant the defendant's motion to set aside the verdict.

The defendant's first claim is that the trial court's instruction on intent denied him the protection of the presumption of innocence and due process of law. His objection is directed to the following portion of the charge: "Every person is presumed to intend the natural and necessary consequences of his own actions." He contends that this instruction shifted the burden of proof of the essential element of intent from the state to him in violation of *Patterson* v. *New York,* 432 U.S. 197, 97 S. Ct. 2319, 53 L. Ed. 2d 281 (1977); *Mullaney* v. *Wilbur,* 421 U.S. 684, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975); and *In re Winship,* 397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970).

Defense counsel failed to request a charge on this issue or to except to the charge that was given. Such

an omission ordinarily would preclude us from reviewing the claimed error. See Practice Book, 1978, §§ 315, 3063; *State* v. *Fredericks,* 154 Conn. 68, 72, 221 A.2d 585 (1966); *State* v. *Rafanello,* 151 Conn. 453, 456, 199 A.2d 13 (1964). An exception to this rule, however, permits a claim to be raised for the first time on appeal where it involves the defendant's constitutional right to a fair trial. *State* v. *Adams,* 176 Conn. 138, 145, 406 A.2d 1 (1978); *State* v. *Hauck,* 172 Conn. 140, 148, 374 A.2d 150 (1976); *State* v. *Evans,* 165 Conn. 61, 69–70, 327 A.2d 576 (1973). This assignment of error, if correct, would amount to such a deprivation; see *Cool* v. *United States,* 409 U.S. 100, 93 S. Ct. 354, 34 L. Ed. 2d 335 (1972); and will therefore be considered.

The defendant admitted the shooting and killing of Thomas McDuffie, but insisted that the shooting was not intentional. He claimed that he was twirling a gun and that it went off accidentally while both were in the defendant's apartment. The issue of intent, therefore, was paramount in this case.

" 'The test to be applied to any part of a charge is whether the charge considered as a whole presents the case to the jury so that no injustice will result.' *State* v. *Mullings,* 166 Conn. 268, 275, 348 A.2d 645; *Siladi* v. *McNamara,* 164 Conn. 510, 515, 325 A.2d 277. It is well established that individual instructions are not to be judged in artificial isolation from the overall charge. *State* v. *Crawford,* 172 Conn. 65, 69, 372 A.2d 154; *State* v. *Ralls,* 167 Conn. 408, 422, 356 A.2d 147." *State* v. *Roy,* 173 Conn. 35, 40, 376 A.2d 391 (1977); see also *Cupp* v. *Naughten,* 414 U.S. 141, 94 S. Ct. 396, 38 L. Ed. 2d 368 (1973). The issue then is whether the charge taken as a whole

was correct in law and sufficient for the instruction of the jury. *Filakosky* v. *Valente,* 175 Conn. 192, 195–96, 397 A.2d 95 (1978).

It is unquestioned that under General Statutes § 53a-54a (a) the state must prove beyond a reasonable doubt that an accused possessed the specific intent to cause death because intent to achieve this end is an essential element of the crime charged. *State* v. *Holley,* 174 Conn. 22, 25–26, 381 A.2d 539 (1977); *State* v. *Bzdyra,* 165 Conn. 400, 403, 334 A.2d 917 (1973). "Since a determination of the defendant's intent involves an examination of his mental state, however, it necessarily must be proved by his statements or actions. *State* v. *Sober,* 166 Conn. 81, 93, 347 A.2d 61; *State* v. *Cofone,* 164 Conn. 162, 164, 319 A.2d 381; *State* v. *Mazzadra,* 141 Conn. 731, 735, 109 A.2d 873. 'Intent may be, and usually is, inferred from conduct'; *State* v. *Cofone,* supra." *State* v. *Holley,* supra, 25–26. This court in some of its opinions has stated that every person is conclusively presumed to intend the natural and necessary consequences of his acts; *State* v. *Holley,* supra, 26; *State* v. *Smith,* 157 Conn. 351, 354, 254 A.2d 447 (1969); but it has never ruled on the issue raised in this appeal—the constitutionality of the use of this presumption in the charge to the jury.

The defendant claims that this charge impermissibly shifted the burden of proof in violation of *Mullaney* and *Patterson.* In *United States* v. *Robinson,* 545 F.2d 301, 305–306 (2d Cir. 1976), the Second Circuit Court of Appeals decided that the "natural and probable consequences" charge was reversible error and reiterated its continued disapproval of this charge on the ground that it appeared to shift the burden of proof. It should be noted, however,

that the charge under fire in *Robinson* was coupled (p. 305) with the phrase: "So, unless the contrary appears from the evidence, the jury may draw the inference that the defendant intended all the consequences which one in like circumstances and possessing like knowledge should reasonably have expected to result from any act knowingly done or knowingly omitted by the defendant." It is the combination of the two phrases which the Second Circuit Court of Appeals found to magnify the potential for burden shifting. *United States* v. *Robinson,* supra, 306. Where the second part of the instruction, "unless the contrary appears from the evidence," was not included in the charge, as is the case in this appeal, the courts have disapproved of the charge but have not found reversible error, if sufficient additional instructions on the issue of intent were given to ensure that the jury understood which side had the burden of proof. See *United States* v. *Erb,* 543 F.2d 438, 447 (2d Cir. 1976); *United States* v. *Barash,* 365 F.2d 395, 402–403 (2d Cir. 1966). In *Mann* v. *United States,* 319 F.2d 404 (5th Cir. 1963), cert. denied, 375 U.S. 986, 84 S. Ct. 520, 11 L. Ed. 2d 474 (1964), on which the defendant has relied heavily, the court found plain error because the instruction complained of there was coupled with the phrase "unless the contrary appears from the evidence."

In *United States* v. *Garrett,* 574 F.2d 778, 781–82 (3d Cir.), cert. denied, 436 U.S. 919, 98 S. Ct. 2265, 56 L. Ed. 2d 759 (1978), the court commented that part of the charge had the potential of "confusing" the jury, but found nevertheless that the charge as a whole, which included instructions on the presumption of innocence, the burden of proving guilt beyond a reasonable doubt, the defendant's and

prosecution's respective responsibilities for producing evidence, proving intention and calling witnesses, fully informed the jury of the government's burden of proof on the question of intent. Further, it found (p. 782) that the "natural and probable consequences" charge, without the "unless the evidence of a case leads you to a contrary conclusion" clause, was not improper.

In this regard, the Superior Court in the present case charged the jury on the presumption of innocence, the burden upon the state to prove the defendant guilty beyond a reasonable doubt, and the burden upon the state to prove every essential element of the crime charged beyond a reasonable doubt. The court also charged shortly after the "natural and necessary consequence" statement that "the only way in which a jury can determine what a person's purpose or intention was at any given time, and from his own testimony, is by determining what his conduct was and what the circumstances were surrounding that conduct and from these infer or conclude what his purpose or intention was."

In view of the fact that the charge was balanced by other portions clearly delineating the state's burden of proof, and that it was not coupled with the more prejudicial portion mentioned above, the charge did not deprive the defendant of any fundamental constitutional right or a fair trial.

The defendant's second assignment of error is that the trial court infringed on his fifth and sixth amendment rights to silence and to the assistance of counsel by permitting the state to prove that the defendant, during police interrogation, had invoked his right to remain silent after consulting with his attorney, and that the defendant's attorney had

objected to certain testing procedures conducted at police headquarters. The second half of this claim is addressed first.

The defendant's argument is that the prosecution violated his constitutionally protected right to counsel by eliciting, on cross-examination of one of the detectives involved in the investigation, that defense counsel had objected to the performance of a neutron test on the defendant's hands. The defendant's claim is that the introduction of this testimony was an abridgement of his constitutional right to counsel, which, taken in conjunction with the testimony that he relied on the advice of counsel in ceasing to give his statement, amounted to a pattern on the part of the prosecution of eliciting evidence of constitutionally protected conduct that would prejudice the jury against him.

The defendant, however, makes only passing reference to this incident in his brief. He also concedes in a footnote to his brief that trial counsel failed to object properly to this testimony. He contends, however, that the introduction of this evidence presents a question of constitutional magnitude and thus must be considered on appeal even though not properly preserved below. *State* v. *Mastropetre,* 175 Conn. 512, 524, 400 A.2d 276 (1978); *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973). As mentioned above, under *Evans* this court in the most "exceptional circumstances" will review a claimed error "where the record adequately supports a claim that a litigant has clearly been deprived of a fundamental constitutional right and a fair trial." *State* v. *Evans,* supra, 70. Here, the defendant claims he has been deprived of his sixth amendment right to counsel. He neglects, however, to substantiate his claim. Not only does he fail to relate what the testi-

mony was to which he is objecting, but he does not even indicate where in the transcript the error occurred and who gave the testimony. This failure to present an adequate record for what the defendant claims is an error of constitutional dimension makes it impossible for this court to consider that claimed error, not simply as a matter of procedure; Practice Book, 1978, §§ 3054 (c) (3), 3063; *State* v. *Weston,* 164 Conn. 635, 636, 325 A.2d 457 (1973); *State* v. *Grayton,* 163 Conn. 104, 109, 302 A.2d 246, cert. denied, 409 U.S. 1045, 93 S. Ct. 542, 34 L. Ed. 2d 495 (1972); *State* v. *Benson,* 153 Conn. 209, 217, 214 A.2d 903 (1965); but because counsel has not presented us with anything of substance we can consider.

The defendant covers at great length, however, his claim that the introduction of testimony that he ceased giving a postarrest statement to police on advice of counsel was an infringement of his fifth and sixth amendment rights to silence and to the assistance of counsel.

The complete scenario is important in determining whether the testimony was, as claimed, a violation of the constitutional prohibition against the use of postarrest silence for impeachment purposes, as enunciated by the United States Supreme Court in *Doyle* v. *Ohio,* 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), and by this court in *State* v. *Cook,* 174 Conn. 73, 76, 381 A.2d 563 (1977), and *State* v. *Ferrone,* 97 Conn. 258, 266, 116 A. 336 (1922).

As with several of the other claims made in this appeal, the defendant did not raise this issue at trial, but has asserted that this court must review it under *State* v. *Evans,* supra, as it is of constitutional mag-

nitude. We agree that the defendant has couched a claim in constitutional terms and the record is sufficient to allow us to review it. From examining the transcript, however, it is obvious that the defendant's constitutional argument is erected on quicksand facts. The law is as the defendant presents it. *Doyle* v. *Ohio,* supra, clearly states that it is a violation of due process for the prosecution to introduce an accused's silence, at the time of arrest and after receiving *Miranda* warnings, for the purpose of impeachment. In *State* v. *Cook,* supra, this court held (p. 76) that "[w]here, however, the accused is in custody, 'our law accords him the right to reply to question or statement, or to remain silent. His silence under such circumstances cannot be laid in evidence against him.' *State* v. *Ferrone,* 97 Conn. 258, 266, 116 A. 336."

References to one's invocation of the right to remain silent is not always constitutionally impermissible, however. Testimony relating to a defendant's invocation of his right to remain silent is admissible to prove the adequacy of the *Miranda* warnings. *State* v. *Ralls,* 167 Conn. 408, 427–29, 356 A.2d 147 (1974). It "could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest. In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest." *Doyle* v. *Ohio,* supra, 619 n.11; see also *United States* v. *Gambina,* 564 F.2d 22, 25 (8th Cir. 1977); *United States* v. *Fairchild,* 505 F.2d 1378, 1383 (5th Cir. 1975).

The testimony to which the defendant is objecting was elicited by the prosecutor from Detective Melvin

Wearing, one of the arresting officers. The state introduced it in its case in chief. Detective Wearing testified as follows: "Q. And did you start to take a statement from him? A. Yes. Q. Did you complete the statement? A. No, I didn't. Q. And why was that? A. Because we were interrupted by Attorney [Earl] Williams. Q. And would you indicate the circumstances under which that occurred? A. I was in the process of taking—taking a dictated statement from Mr. Moye and Attorney Williams came into the Investigator's Service Unit and told Mr. Moye not to give me a statement, to discontinue it. Q. Did you stop at that time questioning him? A. Yes, I did."

The defendant's trial counsel did not object to the introduction of this testimony. If this were the only testimony on the subject, it would seem likely the failure to object was a mistake on the part of trial counsel, brought on by inadvertence or inattention. But trial counsel himself on two separate occasions introduced testimony relating to the partial statement issue: he brought it up shortly thereafter on his cross-examination of Detective Wearing[1] and raised the issue again on his own direct examina-

---

[1] "[By Attorney Earl Williams] Q. Now, at the police station Mr. Moye signed a *Miranda* warning statement?

A. That's correct.

Q. And you told him verbally he did not have to make any statement?

A. That's true.

Q. And he continued to make a statement, is that correct?

A. Yes.

Q. Did he again repeat to you that the shooting was accidental after you had warned him?

A. Yes.

Q. And at the time he came to the police station, was he freely telling you what had happened?

A. Yes. He was in the process of giving me a statement to exactly what occurred."

tion of the defendant.[2] Counsel's decision not to object, coupled with his raising of the issue on two separate occasions and his acquiescence in the offering of the unfinished exculpatory statement as an exhibit by his voluntary "I have no objection to this statement," unequivocally indicate that it was a deliberate tactical choice on his part to use this evidence to the defendant's benefit. The defendant never denied he shot the decedent; his defense was that it was an accident. Thus, it is logical to conclude that counsel was using this testimony of cooperativeness to establish this defense, expecting the jury to infer from the defendant's ready cooperation that he had nothing to hide, that he lacked criminal intent and that the shooting was an accident.

As far as the initial introduction of the testimony by the state is concerned, the testimony that the defendant was voluntarily giving a formal, excul-

---

[2] "[By Attorney Earl Williams] Q. At some point in time did they ask you to come down to the station to give a statement?

A. Yes, they did. They asked me to go down.

Q. And did you go?

A. Yes, I went down.

Q. And when you arrived at the station, did they ask you to give a formal statement?

A. Yes, they did.

Q. The police did?

A. Yes, sir.

Q. Did you in fact give a formal statement to the police. I mean a written statement?

A. I was—I was giving one to them.

Q. You were in the process of giving a formal statement?

A. Yes, I was.

Q. But did you stop giving a statement to the police?

A. Yes, sir, I did.

Q. Why?

A. Because you told me to.

Q. You had called me as your lawyer, is that correct?

A. That's right.

Q. Do you recall what the police charged you with that night?

A. Assault."

patory written statement at police headquarters but stopped upon the advice of his attorney was not used to impeach the defendant's credibility—the forbidden purpose in *Doyle* v. *Ohio,* supra. The evidence was presented by the state to show the investigative effort made by the police and the sequence of events as they unfolded (an acceptable purpose under *State* v. *Ralls,* supra). Moreover, the fact of cessation of his statement was clearly not being used against him as any indication of silence in the face of accusation. Neither was the same offered to impeach the testimony of the defendant in any way. See *Doyle* v. *Ohio,* supra, 619 n.10. Nor does the appellate counsel, who was not the trial counsel, suggest in any way that the defendant's testimony was impeached or that in any manner the cessation of his exculpatory statement was ever used by the state for impeachment purposes either in evidence, by argument, or by inference other than by abstract reference to the legal principles involved. The state's introduction of the testimony was for permissible purposes. Moreover, the defendant's tactical use of it amounted to a waiver of any constitutional objection. *Fay* v. *Noia,* 372 U.S. 391, 83 S. Ct. 822, 9 L. Ed. 2d 837 (1963).

The defendant's third claim of error is that he was denied due process of law because the court admitted a large volume of irrelevant and prejudicial evidence which attacked his character. He claims that the totality of the admitted evidence of his prior bad acts and criminal misconduct denied him his constitutional right to due process. This claim encompasses three categories of objectionable testimony: (1) indirect character evidence, (2) evidence of prior criminal misconduct, and (3) personal admissions of misconduct.

In his brief the defendant asserts that the trial court allowed the state to introduce prejudicial and irrelevant testimony concerning his character, the sole purpose of which was to prejudice the jury. All of this testimony was reproduced verbatim in the defendant's brief. In general, it concerned the following areas: it was established that the defendant had purchased, at a cost of approximately $2800, a red, heart-shaped bed for his apartment; that the apartment was used by the defendant as a "play-pad"; that a delivery man who testified at the trial was paid, "in cash," approximately $980; that the defendant had a large amount of cash in a briefcase in the apartment; that at the time of his arrest there were several other guns, besides the one with which the deceased was killed, on a table in the apartment; and that the defendant had a "more than ample" supply of liquor in his apartment.

Evidence of character (bad or good) is usually introduced or excluded for the purpose of proving that on a particular occasion the defendant acted in keeping with his disposition. McCormick, Evidence (2d Ed.) § 190, p. 447; *State* v. *Martin,* 170 Conn. 161, 365 A.2d 104 (1976); *State* v. *Blake,* 157 Conn. 99, 104, 249 A.2d 232 (1968).

The state may not introduce evidence of the bad character of the defendant when offered merely to show that he is a bad man and hence more likely to commit a crime. McCormick, op. cit. § 191.

The testimony specifically complained of in the defendant's brief did not go to establishing that the defendant had the propensity to commit murder (the crime for which he was being tried): the defendant

does not point to any evidence introduced as to his propensity to violence or aggressive behavior. Rather, it is testimony that went more to life-style than to character traits. Moreover, as an examination of the transcript reveals, trial counsel objected to all of the testimony in question on the ground that it was irrelevant and prejudicial. Evidence that is excludable for one purpose may be admissible for other purposes. 1 Wigmore, Evidence (3d Ed.) § 215; *State* v. *Simborski,* 120 Conn. 624, 631, 182 A. 221 (1936). In supporting the admissibility of the evidence here in question, the prosecution asserts it was relevant to show that the defendant had a motive for killing the deceased, and to show the circumstances present at the time of the homicide.

"As to the prejudicial effect of the testimony, the trial judge, in the exercise of judicial discretion, must decide whether the probative value of the testimony outweighs the prejudice likely to result from its admission. *State* v. *Ralls,* 167 Conn. 408, 417, 356 A.2d 147; *State* v. *Moynahan,* 164 Conn. 560, 597, 325 A.2d 199." *State* v. *Martin,* supra, 166. The determination of relevance, moreover, must be made according to reason and judicial experience. *Robinson* v. *Faulkner,* 163 Conn. 365, 371, 306 A.2d 857 (1972). This determination requires the exercise of the court's discretion. *State* v. *Blyden,* 165 Conn. 522, 531, 338 A.2d 484 (1973).

This court expressed the criteria for determining whether the trial court had abused its discretion in *State* v. *Martin,* supra, 166: " 'In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling . . . . Reversal is required only where an abuse of discretion is

manifest or where injustice appears to have been done.' *State* v. *Brown,* 169 Conn. 692, 702, 364 A.2d 186. '[T]he ultimate issue is whether the court could reasonably conclude as it did.' *DiPalma* v. *Wiesen,* 163 Conn. 293, 299, 303 A.2d 709."

Trial counsel objected to the materiality of the testimony as to the purchase and cost of the bed, not to its prejudicial effect. This testimony was relevant in that it established how and why the delivery men were in the defendant's apartment at the time of the shooting and any bias or motive that they might have for testifying. The defendant's objection to Detective Wearing's testimony that the defendant told him he intended to use his apartment as a "playpad" was that it was immaterial. This testimony, although bordering on the suggestive, was not irrelevant as it explained the presence in the apartment of the deceased, the defendant himself, and diverse witnesses who ultimately testified at the defendant's trial. The testimony as to the presence of a great deal of cash in the apartment and its being used to pay for the bed was not irrelevant, as objected to, because it went to establish what was claimed by the state to be the defendant's motive. The testimony as to the guns was not objected to at trial. Detective Wearing in describing the apartment as he saw it when investigating mentioned that "[t]here was whiskeys, beers." This was in response to a question about what was in the defendant's den. The answer was not inherently prejudicial, and the defendant did not object. The state is not obliged to present evidence of a homicide in a vacuum; a description of the area where it occurred, the persons present and the activity in progress at the time of a killing are not irrelevant to the matter in issue.

Finally, in its charge to the jury,[3] the court strongly cautioned that the defendant was on trial for murder, not for his life-style. This charge more than compensated for any prejudicial effect the testimony in question might have had.

The defendant also complains that the court permitted the state to introduce testimony showing the defendant had been involved in prior criminal misconduct. The evidence in question included: (1) testimony by a police officer that he had known the defendant in his professional capacity as a policeman prior to the defendant's arrest for the shooting of the deceased; (2) testimony by a cousin of the deceased who testified that he sold narcotics for the defendant; (3) the hearsay recollections of the deceased's sister who testified that her brother was selling narcotics for some unnamed person.

On redirect, the prosecution asked the arresting officer if he, "as a police officer," knew the defendant prior to the shooting of the decedent, Thomas

---

[3] "You may or may not agree with his life style. You may or may not like the man. You may or may not like his moral character. But he is not on trial for any of these things. He is on trial for murder and for the lesser included criminal homicide charges. You may not hold against him, so to speak, these things about his life which you do not like and with which you do not agree because he is not on trial for those. You may not punish him because you think or suspect he may be involved in other illegal activities because he is not charged with that here. And if that is so, then that will be up to the law to take its course in the normal course in another [sic] proceedings. He is not on trial here for that and your verdict should not reflect that except insofar as you find that any of those facts or any of that conduct is relevant to the charge here which is the charge of murder and lesser included criminal homicide charges. You may find that some of this evidence is relevant on questions of motive. And I think most of it was offered on that ground, on the claim of tending to show a motive. And for that purpose, insofar as it is relevant, you may consider it. But just keep in mind that he is not on trial for those particular matters."

McDuffie. After the detective had answered affirmatively, defense counsel objected on the grounds that it was not brought up in cross-examination. The response was not objected to as being irrelevant or excludable as evidence of prior criminal conduct. There was no exception taken. We are not referred to any other portion of the record or transcript relating to this piece of evidence. It is impossible for this court to rule on whether the trial court abused its discretion in making an evidentiary ruling when there is no record. *O'Connor* v. *Dory Corporation,* 174 Conn. 65, 71, 381 A.2d 559 (1977).

The state called the cousin of the deceased and he testified that he worked for the defendant. The defendant's counsel objected to this evidence as immaterial to the shooting of the victim. After objection and exception, the witness testified that he and the deceased were employed by the defendant as sellers of marihuana, that the defendant ran a large drug-selling operation employing only "younger kids." He also testified to the defendant's other holdings and activities. He further testified that a week before McDuffie's death, the defendant slapped and kicked McDuffie because he had made a mistake on money earned from selling marihuana. In the course of that argument, the witness testified that the defendant had told McDuffie he would be killed if he held out.

The central issue in this trial was whether the killing was intentional or accidental. While the state is not obligated to prove motive as an element of murder, the presence of a motive would be relevant to proving intent. *State* v. *Hoyeson,* 154 Conn. 302, 307, 224 A.2d 735 (1966). The prosecution's theory was that the defendant killed McDuffie, who was

one of the defendant's runners, because McDuffie had been holding back money from him from his narcotics sales. All of the testimony[4] complained of tended to prove that the defendant was involved in the narcotics trade and that the deceased worked for him as a pusher. This testimony fits within an exception to the prohibition against evidence of prior criminal conduct: it concerns motive. See *State* v. *Jenkins,* 158 Conn. 149, 152–53, 256 A.2d 223 (1969). Since it has the probative effect of showing motive, the trial court did not abuse its discretion in ruling it relevant and admissible.

The sister of the deceased testified that he was selling narcotics for some unnamed person. In the court's charge to the jury this testimony was stricken. In so doing, the court mistakenly stated that the sister had stated that the deceased had told her "he sold marihuana for the defendant." This stricken evidence and the inadvertent slip by the court cannot be viewed as prejudicial error in view of the entire evidence in the case and the charge taken as a whole.

The defendant further contends that, in addition to the admission of evidence attacking his character and evidence pertaining to prior criminal misconduct during the presentation of the state's case, the court allowed the state to offer similar evidence during its cross-examination of him. The defendant cites no cases supporting his argument other than in the abstract, but insists that the admission of this testimony prejudiced the jury against him. The defendant specifically complains that the court allowed the state to offer evidence as to: the defendant's annual

---

[4] The objection at trial to the above testimony was that it was irrelevant or hearsay; defense counsel did not object at that time to it as being evidence of prior crimes.

income and its source; the presence of large amounts of cash in the defendant's apartment; the defendant's possession of a rifle, capable of firing multiple shots like a machine gun; the defendant's possession of a late-model, red Cadillac convertible; the defendant's conviction for car theft and for selling liquor without a permit; the prior arrest of the defendant for failure to pay a gas station attendant for gasoline; the presence of narcotics in the defendant's car and in an apartment house owned by him; and the possibility that because of the defendant's gambling he might be evading income tax.

"It is well established that when a defendant takes the stand and testifies in his own behalf he may be cross-examined concerning prior convictions for the purpose of impeaching his credibility as a witness in the same manner as any other witness. *Spencer* v. *Texas,* 385 U.S. 554, 87 S. Ct. 648, 17 L. Ed. 2d 606." *State* v. *Marquez,* 160 Conn. 47, 52–53, 273 A.2d 689 (1970).

"It has long been the law in this state that inquiries on cross-examination are 'in a measure, discretionary wtih the trial court.' *Spiro* v. *Nitkin,* 72 Conn. 202, 205, 44 A. 13. The trier is often called upon to weigh the question whether the prejudicial tendency of evidence outweighs its probative value. In a criminal trial, evidence which tends to prove the commission of other crimes by the accused does not render it inadmissible if it is otherwise relevant and material. See *State* v. *Holliday,* 159 Conn. 169, 172, 268 A.2d 368. . . . See *State* v. *Harris,* 159 Conn. 521, 531, 271 A.2d 74. It is enough to say that the trial judge is the arbiter of the many circumstances which may arise during a trial in which his function is to assure a fair and just outcome. We

believe that if a defendant testifies and, thereafter, evidence of a prior conviction is offered under circumstances in which its prejudicial effect far outweighs its materiality and relevancy on the issue of credibility in a criminal trial its admissibility should be determined by the exercise of a sound judicial discretion." *State* v. *Marquez,* supra, 52.

Other than exploration of credibility, the scope of cross-examination is limited to the subject matter of the direct examination. *Grievance Committee* v. *Dacey,* 154 Conn. 129, 150, 222 A.2d 339 (1966); *Mendez* v. *Dorman,* 151 Conn. 193, 198, 195 A.2d 561 (1963).

In his brief the defendant objects to the allowance by the trial court of testimony about the presence of large amounts of cash in his apartment. He claims that the testimony was elicited from the defendant on cross-examination. The portion of the transcript he refers to, however, is testimony given by a defense witness. Since this example does not support the defendant's claim that his testimony on cross-examination was used as substantive evidence instead of impeachment evidence, we will not consider it further.

The defendant claims error in the trial court's admission of testimony as to what type of car he had. Defense counsel objected on the grounds that it was immaterial. The trial court ruled it was relevant and admissible. The portion of transcript referred to by the defendant contains testimony to the effect that a defense witness who had testified that the deceased was killed accidentally when the defendant was twirling the gun involved in the shooting was asked on cross-examination if he drove the defendant's car. There was an objection and

the state responded that the witness indicated a business relationship with the defendant and that the state was only pursuing that relationship. The relevancy of this testimony may not be immediately apparent but its admission was within the discretion of the court. *Spiro* v. *Nitkin,* supra, 205.

The references made to prior convictions and arrests were all objected to as being irrelevant. As we stated previously, it is within the discretion of the trial court to rule on the relevancy of evidence tending to prove the commission of other crimes. *State* v. *Marquez,* supra, 52. The state claimed that all this went to establishing motive, i.e., that the defendant was dealing in drugs, gambling and the illegal sale of liquor, that the deceased was one of his drug pushers and that the defendant killed him for holding back money from him. The testimony as to the presence of drugs in the defendant's car and in his wife's apartment also was relevant to establishing motive in that it showed the milieu in which the defendant operated. The evidence of the possibility of income tax evasion went first to the defendant's credibility which he had put in issue by taking the stand; *State* v. *Marquez,* supra; and second to the establishing of motive. The defendant objected to the admission of the evidence as to his possession of a rifle on grounds of relevancy. The previous evidence had indicated that the defendant had a rifle in the apartment in which the shooting took place. The state asked the defendant if he could fire a series of shots with the rifle. Upon objection, the state claimed that there was previous evidence of a machine gun and the only purpose was to clear up whether a rifle might be inferred to be a machine gun. The court did not abuse its discretion in the ruling.

After examining all of the above testimony in its context in the transcript, we hold that the trial court did not abuse its discretion in holding that its probative value outweighed its prejudicial tendency.

In his next assignment of error, the defendant raises a fourth amendment claim as to the admission of testimony concerning a briefcase that he contends, for the first time on appeal, was unlawfully seized.[5] We find that that assignment of error has no merit.

During the state's direct examination of Lieutenant Thomas P. Muller, one of the officers who investigated the killing, the prosecution inquired about the presence of other people in the defendant's apartment and what they were doing. In response, Lieutenant Muller began to testify that there was a female with a briefcase who was trying to leave the apartment as he was entering. Defense counsel immediately objected to this testimony as being "immaterial." The prosecution claimed it on the ground that it was material and relevant to establishing motive. At this point the jury were excused and the officer was allowed to testify, in response to questioning by both the prosecution and defense, that the briefcase the woman was carrying contained $2000 in cash, that he opened it without a warrant and that there was no blood on it or anything of that nature. Defense counsel objected on the ground that the testimony[6] was immaterial: "I will still object on the claims of immateriality. I see no connection between the money and the charge." In response, the

[5] There was no attempt to enter the briefcase and its contents, "$2000 in cash," into evidence. So its search and seizure, apart from the testimony, is not an issue here.

[6] Defense counsel also initially objected to the testimony because there was no warrant to take the suitcase, but abandoned this claim and did not resurrect it again until this appeal.

prosecution asserted its materiality to the issue of motive: "[By assistant state's attorney John J. Kelly] I am claiming, your Honor—your Honor, this is one other fact the jury is entitled to consider in this case in reaching its conclusion. It may very well be. And they may find it to be material and relevant on the issue of motive. Number two, I believe your Honor has raised a point that I was about to, namely I don't believe there is any standing on this case on the part of Mr. [Earl] Williams to raise this issue. We are not claiming it was taken from his client but from the female." The defense's final objection was "on the claims of immateriality." The court directly overruled the defense's objection: "[By the court] Of course at this early stage we really don't know completely. But as I understand, this is a situation where there was a shooting there and there is a question of why it happened and how it happened. And the state claims it as some evidence possibly in the link or chain that shows some motive. And under the circumstances, I think it ought to be admitted so I am going to overrule your objection." As can be seen by the court's language, the defense's objection was addressed to the immateriality and irrelevance of the testimony, not to the fact that it was the fruit of an illegal seizure. It should be noted that the defendant never filed a motion to suppress at pretrial as required by statute. See General Statutes § 54-33f; Practice Book, 1978, § 824. Nor did he indicate by his objections to the testimony that he wished it suppressed as an infringement of the defendant's fourth amendment rights. The defendant argues now that the trial court's ruling was based on an erroneous determination that the defendant lacked standing to challenge the warrantless seizure of the briefcase. As illustrated above

by the excerpts from the transcript, the trial court specifically ruled in response to the defendant's direct objection that the testimony was admissible because it was material and relevant.

Under *State* v. *Evans,* 165 Conn. 61, 69, 327 A.2d 576 (1973), as we have noted before in this opinion, this court will review errors of constitutional dimension even if not raised at the trial court only where "exceptional circumstances" exist, i.e., (1) a new constitutional right has arisen between the time of trial and appeal, or (2) the record adequately supports a claim that a litigant has clearly been deprived of a fundamental constitutional right and a fair trial. *State* v. *Evans,* supra, 70. The instant claim fits neither criterion. There is no new constitutional right claimed and the record does not present a claim that the defendant was deprived of a fair trial. The issue was the relevancy of the testimony. That is not an issue of constitutional dimension, but rather of the trial court's discretion. *State* v. *Blyden,* 165 Conn. 522, 531, 338 A.2d 484 (1973). On the record presented, we find that the trial court did not abuse that discretion.

The defendant's final claim of error is that he was denied due process of the law when the jury unreasonably and illogically inferred from his conduct that he intended to murder the deceased. The prosecution has rephrased and answered this rather oblique claim as if it were a challenge to the trial court's refusal to grant the defendant's motion to set aside the verdict. We will address it in this manner also.

"When a jury verdict is challenged on the ground that the evidence is insufficient to sustain the verdict,

the issue is whether the jury could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify the verdict of guilty beyond a reasonable doubt. *State* v. *Jones,* 173 Conn. 91, 376 A.2d 1077; *State* v. *Chetcuti,* 173 Conn. 165, 172, 377 A.2d 263. In ruling on such a motion, the evidence presented at the trial must be given a construction most favorable to sustaining the jury's verdict. *State* v. *Chetcuti,* supra. If, however, the evidence is insufficient to meet the burden of proof of guilt beyond a reasonable doubt, bearing in mind that the state has the burden of establishing by such proof every essential element of the crime charged, the verdict must be set aside. *State* v. *Benton,* 161 Conn. 404, 406, 288 A.2d 411; *State* v. *Kelsey,* 160 Conn. 551, 553, 274 A.2d 151; *State* v. *McGinnis,* 158 Conn. 124, 129, 256 A.2d 241." *State* v. *Jackson,* 176 Conn. 257, 262, 407 A.2d 948 (1978). There is no distinction between direct and circumstantial evidence so far as probative force is concerned. *State* v. *Chetcuti,* supra, 172; *State* v. *Cari,* 163 Conn. 174, 179, 303 A.2d 7 (1972).

In the present case, the defendant admitted that he shot McDuffie, but claimed that the shooting was accidental: unaware that the gun had been placed in a ready-to-fire status, the defendant twirled it while pointing it at the decedent and it went off. In order to prove that the shooting had not been accidental but, rather, intentional as required for a finding of guilt under § 53a-54a (a), the state relied most heavily on the testimony of one Marc Anthony Ford, a cousin of the victim, who claimed that both he and Thomas McDuffie had been teenage dealers of marihuana for the defendant; that approximately one

week prior to the shooting of McDuffie, Ford had observed the defendant beating and kicking the smaller McDuffie because the latter had been "shorting" him (i.e., holding back proceeds) on drug sales made by McDuffie for the defendant. Ford also testified that he heard the defendant tell McDuffie, at the time of the beating, that he would be "capped" (i.e., shot) if he continued to "short" the defendant. Thus, the question of a possible motive was injected into the case.

The other particularly damaging testimony against the defendant came from the expert testimony of James McDonald, the director of the South Central Regional Crime Laboratory, who conducted various tests with regard to the handgun the defendant admitted he shot the victim with. McDonald testified that in order to fire the Colt .45 semiautomatic handgun, one would first have to load a seven-cartridge magazine and insert same into the grip area of the weapon. Also, before the gun could be fired, one would have to pull back a slide near the finger grip. There is also a grip safety feature on the gun which must be depressed before the weapon can be fired. If the grip safety is not depressed, the weapon will not fire, even if the trigger is pressed. Similarly, the jury were told that the weapon requires six pounds of pressure on the trigger before it may be fired, what McDonald testified was a "pretty safe trigger squeeze." In sum, the jury were obviously left to draw the inference that the murder weapon had not and could not have gone off by the mere act of "twirling" (as the defendant claimed) but would discharge only after elaborate steps had been taken. As McDonald testified, the gun was not capable of being discharged accidentally.

McDonald also testified about gunpowder residue tests he conducted on a bandana worn on the head of the victim and stated, based on his testing, that the muzzle of the murder weapon had been within eighteen inches of the bandana (and the victim's head) when the weapon was fired. This was in contradistinction to the testimony of the defendant that he had been in the doorway of the den, approximately seven feet from where the victim fell, at the time of the shooting. McDonald testified that it would be physically impossible for gunpowder residue to be on the bandana worn by the victim if the defendant had been the approximately seven feet from him that he claimed.

Intent is an element of the crime of murder with which the defendant is charged. General Statutes § 53a-54a; *State* v. *Crawford,* 172 Conn. 65, 372 A.2d 154 (1976); *State* v. *Biting,* 162 Conn. 1, 291 A.2d 240 (1971). The state had the burden of proving it beyond a reasonable doubt. *State* v. *Beauton,* 170 Conn. 234, 241, 365 A.2d 1105 (1976); *Patterson* v. *New York,* 432 U.S. 197, 97 S. Ct. 2319, 53 L. Ed. 2d 281 (1977); *Mullaney* v. *Wilbur,* 421 U.S. 684, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975); *In re Winship,* 397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970).

It is within the province of the jury to draw reasonable and logical inferences from the facts proven. *State* v. *Pundy,* 147 Conn. 7, 12, 156 A.2d 193 (1959); *State* v. *Foord,* 142 Conn. 285, 294, 113 A.2d 591 (1955). Our inquiry is directed to whether, on the facts established and inferences reasonably to be drawn therefrom, the verdict can be supported. *State* v. *Benton,* 161 Conn. 404, 410, 288 A.2d 411 (1971).

On the basis of the expert testimony as to the impossibility of the gun's going off accidentally, the evidence of motive, and the defendant's admission of the killing, the jury were justified in finding that the state had proved the guilt of the defendant beyond a reasonable doubt.

There is no error.

In this opinion the other judges concurred.